**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge Christine M. Arguello**

Civil Action No. 08-cv-02743-CMA-BNB

NAU HOLDINGS, LLC and
HORNY TOAD ACTIVEWEAR, INC.

    Plaintiffs, Counter-Defendants,

v.

DLORAH, INC.

    Defendant, Counter-Plaintiff.

---

**OPINION AND ORDER GRANTING PLAINTIFFS' MOTION FOR JUDGMENT ON THE PLEADINGS AS TO COUNT 4 OF DLORAH, INC.'S COUNTERCLAIMS**

---

This is a trademark lawsuit. This matter is before the Court on Plaintiffs' Motion for Judgment on the Pleadings as to Count 4 of Dlorah, Inc.'s Counterclaims (Doc. # 32). Jurisdiction is proper pursuant to 15 U.S.C. § 1121 and 28 U.S.C. §§ 1331, 1338(a), 1338(b), 1367(a), and 2201. For the reasons stated below, the Court GRANTS Plaintiffs' Motion for Judgment on the Pleadings as to Count 4 of Dlorah, Inc.'s Counterclaims.

### I. BACKGROUND

**A.** **FACTS**

For purposes of Plaintiffs' Motion, all well-pleaded facts in Defendant's Counterclaims are assumed to be true, and all reasonable inferences therefrom are

drawn in a light most favorable to Defendant.  Accordingly, the following facts must be taken as true:

Defendant and Counter-Plaintiff Dlorah, Inc. ("Dlorah"), is a South Dakota corporation doing business as National American University.  National American University offers higher-education services online and at sixteen brick-and-mortar sites across the United States.  Dlorah owns registered trademarks in "NAU" and "NATIONAL AMERICAN UNIVERSITY" in connection with educational services.  Dlorah sells apparel and merchandise bearing those trademarks to the public.  Dlorah does not sell its branded apparel and merchandise online via its website www.national.edu.  (Doc. # 19, ¶¶ 8, 9,10, and 30.)

Plaintiff and Counter-Defendant Nau Holdings, LLC ("Nau Holdings"), is a clothing company located in Portland, Oregon, and incorporated in Delaware.  Nau Holdings sells high-end clothing and apparel products bearing these marks at retail establishments and via the Internet (www.nau.com).  Nau Holdings owns four Trademark Applications for the marks "NAU" and "NAU (stylized)" that are currently pending before the U.S. Patent and Trademark Office.  Defendant has filed a Notice of Opposition with Trademark Trial and Appeal Board against these Applications.  The opposition proceeding is currently pending.  Lladro USA, Inc. and The Arizona Board of Regents on behalf of Northern Arizona University ("Northern Arizona University") also opposed these Applications.  In September and November 2008, Nau Holdings settled the oppositions with Lladro USA, Inc. and Northern Arizona

University by agreeing to restrict the identifications of goods and services in its Applications in certain ways, including by specifying that its clothes are not collegiate related. (Doc. # 1, ¶¶ 3 16,17,19, and 20.)

Nau Holdings manner of use of the mark "NAU" is consistently in all lower-case, stylized letters. Its mark does not appear as an acronym, and is pronounced as a word phonetically similar to "now." Nau Holdings does not use its mark in an ornamental manner on the front of shirts, sweatshirts, pants, hats, or other clothing. Its mark is used only on tags and labels. (Doc. # 1, ¶¶ 23 and 24.)

Plaintiff and Counter-Defendant Horny Toad Activewear, Inc. ("Horny Toad"), is a clothing company located in Santa Barbara, California, and incorporated in Delaware. Horny Toad is a parent company to Nau Holdings. Horny Toad established Nau Holdings when it purchased the assets of a predecessor clothing company, Nau, Inc., which began selling NAU-branded items in 2005 but went out of business in 2008. Nau, Inc. was the original applicant of the four trademark applications currently owned by Nau Holdings. Nau, Inc. also registered the Internet domain name, "www.nau.com," which was also transferred to Nau Holdings in the 2008 sale. (Doc. # 1 at 4; Doc. # 19, ¶¶ 17 and 18.)

**B.     PROCEDURAL HISTORY**

Plaintiffs filed their Complaint on December 16, 2008 (Doc. # 1), and Defendant Dlorah, Inc. filed its Answer and Counterclaims on May 27, 2009 (Doc. # 19). Plaintiffs filed their Motion for Judgment on the Pleadings as to Count 4 of Dlorah, Inc.'s

Counterclaims on July 9, 2009 (Doc. # 32), Defendant responded on July 27, 2009 (Doc. # 38), and Defendant replied on August 11, 2009 (Doc. # 40).

## II.  STANDARD OF REVIEW

A motion for judgment on the pleadings under Fed. R. Civ. P. 12(c) is governed by the same standard of review applicable to a motion to dismiss under Fed. R. Civ. P. 12(b)(6).  *Nelson v. State Farm Mut. Auto Ins. Co.*, 419 F.3d 1117, 1119 (10th Cir. 2005).  Fed. R. Civ. P. 12(b)(6) provides that a defendant may move to dismiss a claim for "failure to state a claim upon which relief can be granted."  Fed. R. Civ. P. 12(b)(6). "The court's function on a Rule 12(b)(6) motion is not to weigh potential evidence that the parties might present at trial, but to assess whether the plaintiff's complaint [in this case, defendant's counterclaim] alone is legally sufficient to state a claim for which relief may be granted."  *Dubbs v. Head Start, Inc.*, 336 F.3d 1194, 1201 (10th Cir. 2003) (citations and quotation marks omitted).  "A court reviewing the sufficiency of a complaint presumes all of plaintiff's factual allegations are true and construes them in the light most favorable to the plaintiff."  *Hall v. Bellmon*, 935 F.2d 1106, 1109 (10th Cir. 1991).

The Supreme Court recently retired "the accepted rule that a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief."  *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957), *abrogated by Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007).  In *Twombly*, the Court replaced the *Conley* standard

with a new standard that "prescribed a new inquiry for [courts] to use in reviewing a dismissal: whether the complaint contains 'enough facts to state a claim to relief that is plausible on its face.'" *Ridge at Red Hawk, L.L.C. v. Schneider*, 493 F.3d 1174, 1177 (10th Cir. 2007) (quoting *Twombly*, 550 U.S. at 570). The Court explained that "a plaintiff must 'nudge his claims across the line from conceivable to plausible' in order to survive a motion to dismiss." *Id.* (internal citation and brackets omitted). "Thus, the mere metaphysical possibility that some plaintiff could prove some set of facts in support of the pleaded claims is insufficient; the complaint must give the court reason to believe that this plaintiff has a reasonable likelihood of mustering factual support for these claims." *Id.*

In evaluating a Rule 12(b)(6) motion to dismiss, courts may consider not only the complaint itself, but also attached exhibits, *Indus. Constructors Corp. v. U.S. Bureau of Reclamation*, 15 F.3d 963, 964-65 (10th Cir. 1994), and documents incorporated into the complaint by reference, *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308 (2007); *TMJ Implants, Inc. v. Aetna, Inc.*, 498 F.3d 1175, 1180 (10th Cir. 2007). "[T]he district court may consider documents referred to in the complaint if the documents are central to the plaintiff's claim and the parties do not dispute the documents' authenticity." *Alvarado v. KOB-TV, L.L.C.*, 493 F.3d 1210, 1215 (10th Cir. 2007) (internal quotation omitted).

## III.  ANALYSIS

Plaintiffs filed this action seeking declatory relief for non-infringement of Defendant's trademarks.  In its Answer, Defendant counterclaimed seeking relief against Plaintiffs for violations of the Lanham Act, common law trademark and service mark infringement, common law unfair competition, state and common law dilution, and a declaration that Plaintiffs' trademark applications are not registrable with the United States Patent and Trademark Office.  Plaintiffs then filed their Motion for Judgment on the Pleadings as to Count Four of Defendant's counterclaims which alleges that Plaintiffs violated the Anti-Cybersquatting Consumer Protection Act ("ACPA"), 15 U.S.C. § 1125(d), by registering and using the website (www.nau.com) with a bad faith intent to profit.

"The ACPA was enacted in 1999 in response to concerns over the proliferation of cybersquatting – the Internet version of a land grab."  *Virtual Works, Inc. v. Volkswagen of America, Inc.*, 238 F.3d 264, 267 (4th Cir. 2001).  It was enacted because then-existing law did not expressly prohibit the practice of cybersquatting, and cybersquatters had begun to insulate themselves from liability under the Federal Trademark Dilution Act, 15 U.S.C. § 1125.  *Id.*  In the Senate Report accompanying the ACPA, cybersquatters are defined as those who: (1) "register well-known brand names as Internet domain names in order to extract payment from the rightful owners of the marks;" (2) "register well-known marks as domain names and warehouse those marks with the hope of selling them to the highest bidder;" (3) "register well-known marks to prey on consumer confusion by misusing the domain name to divert customers from

the mark owner's site to the cybersquatter's own site;" (4) "target distinctive marks to defraud consumers, including to engage in counterfeiting activities." S. Rep. No. 106-140, at 5-6 (1999) (Conf. Rep.).

Pursuant to the ACPA, a cybersquatter is potentially liable to the owner of a protected mark if that person:

> (i) has a bad faith intent to profit from the mark. . . ; and
> (ii) registers, traffics in, or uses a domain name that –
>     (I) in the case of a mark that is distinctive . . . , is identical or confusingly similar to that mark;
>     (II) in the case of a famous mark. . . , is identical or confusingly similar to or dilutive of that mark; or
>     (III) is a trademark, word, or name protected by reason of section 706 of Title 18 or section 220506 of Title 36.

15 U.S.C. § 1125(d)(1)(A).

In order to defeat Plaintiffs' Motion for Judgment on the Pleadings as to Count Four, the Answer, Counterclaims, and attached exhibits must contain enough facts for this Court to find it plausible (1) that Defendant's NAU mark is distinctive, (2) that the domain name registered by Plaintiffs, www.nau.com, is identical or confusingly similar to Defendant's NAU mark, and (3) that Plaintiffs used or registered the domain names with a bad faith intent to profit. *See Cleary Building Corp. v. David A. Dame, Inc.*, No. 09-cv-01578-CMA-MEH, --- F.Supp.2d ----, 2009 WL 4506414, at *4 (D. Colo. Dec. 1, 2009) (citing *Utah Lighthouse Ministry v. Foundation for Apologetic Info. & Res.,* 527 F.3d 1045, 1057 (10th Cir. 2008)).

In this case, for purposes of this Motion, Plaintiff does not dispute that Defendant's NAU mark is distinctive, and thus the first element of the ACPA claim is

7

met. As to the second element, for purposes of this Motion, the Court finds that it is plausible that "www.nau.com," is confusingly similar to the NAU mark. *See, e.g.,* McCarthy on Trademarks § 25:78; *DaimlerChrysler v. The Net Inc.*, 388 F.3d 201 (6th Cir. 2004) (accused domain name "foradodge.com" is confusingly similar to the trademark DODGE for autos).

As to the third element, Defendant argues that it has pled facts sufficient to state a plausible claim that Plaintiff had a bad faith intent to profit. Defendant alleges the following facts in support of this claim:

- Defendant has owned U.S. Trademark Registration Nos. 2,202,126 and 2,220,866 for over a decade. These registrations are valid and in full force and effect and have become incontestable by operation of law.

- Defendant has offered for sale and advertised these goods and services nationwide since 1997.

- Defendant operates sixteen locations in the United States and on-line, offering higher education services under the trademarks NATIONAL AMERICAN UNIVERSITY and NAU.

- Defendant sells a wide variety of merchandise under its trademarks to the public, including men's and women's apparel, hats, school supplies, decals, license plates, key chains, and cups.

- Defendant's marks are heavily advertised and promoted by Defendant throughout its trade area as well as on the internet, and are well-known throughout the United States.

- Defendant has invested millions of dollars promoting the marks and continuously used the marks nationwide since 1997.

- Nau, Inc. filed four "intent-to-use" trademark applications to register the NAU mark in 2005 and 2006.

- Nau, Inc. was not using the marks in commerce at the time it filed its applications.

8

- Defendant opposed these applications immediately after they were published for opposition by the United States Patent & Trademark Office in 2006.

- The parties engaged in settlement discussions in early 2007 wherein Defendant demanded Nau, Inc. cease all use of the NAU mark in commerce.

- Nau, Inc. began use of the www.nau.com domain name after Defendant opposed its applications and engaged in settlement discussions with Nau, Inc.

- Over a year after Defendant filed its notices of opposition, Nau, Inc. ceased operations in May of 2008 and was acquired by Plaintiff Horny Toad.

- Plaintiff Horny Toad organized a subsidiary, Plaintiff Nau Holdings, LLC, to house the Nau, Inc. assets.

- Nau, Inc. assigned its trademark rights to Plaintiff Nau Holdings, LLC on June 17, 2008, whereby Plaintiffs are charged with notice of the opposition proceedings.

- The www.nau.com domain name was transferred to Plaintiff Horny Toad on August 17, 2008.

- Plaintiffs continue to use of the NAU mark and www.nau.com domain name.

- Plaintiff Nau Holdings and Plaintiff Horny Toad's business operations overlap because they share employees and assets.

(Doc. # 19, ¶¶ 8-13,19, 24, 25, 27-30, 32.)

In its report on the ACPA, the Senate Judiciary Committee distilled the crucial elements of bad faith to mean an "intent to trade on the goodwill of another's mark." S. Rep. No. 106-140, at 9 (1999) (Conf. Rep.). The ACPA enumerates nine nonexclusive factors to assist the court in determining whether the use of a trademark

involves a bad faith intent to profit. 15 U.S.C. § 1125(d)(1)(B)(I).  According to 15 U.S.C. § 1125 (d)(1)(B)(I), a court *may* consider factors such as:

> (I)  the trademark or other intellectual property rights of the person, if any, in the domain name;
> (II)  the extent to which the domain name consists of the legal name of the person or a name that is otherwise commonly used to identify that person;
> (III)  the person's prior use, if any, of the domain name in connection with the bona fide offering of any goods or services;
> (IV)  the person's bona fide noncommercial or fair use of the mark in a site accessible under the domain name;
> (V)  the person's intent to divert consumers from the mark owner's online location to a site accessible under the domain name that could harm the goodwill represented by the mark, either for commercial gain or with the intent to tarnish or disparage the mark, by creating a likelihood of confusion as to the source, sponsorship, affiliation, or endorsement of the site;
> (VI)  the person's offer to transfer, sell, or otherwise assign the domain name to the mark owner or any third party for financial gain without having used, or having an intent to use, the domain name in the bona fide offering of any goods or services, or the person's prior conduct indicating a pattern of such conduct;
> (VII)  the person's provision of material and misleading false contact information when applying for the registration of the domain name, the person's intentional failure to maintain accurate contact information, or the person's prior conduct indicating a pattern of such conduct;
> (VIII)  the person's registration or acquisition of multiple domain names which the person knows are identical or confusingly similar to marks of others that are distinctive at the time of registration of such domain names, or dilutive of famous marks of others that are famous at the time of registration of such domain names, without regard to the goods or services of the parties; and
> (IX)  the extent to which the mark incorporated in the person's domain name registration is or is not distinctive and famous within the meaning of subsection (c) of this section. (emphasis added.)

"These factors are designed to balance the property interests of trademark owners with the legitimate interests of Internet users and others who seek to make lawful uses of others' marks. . ." H.R. Rep. No. 106-412, at 10 (1999) (Conf. Rep.). These factors are given to courts as a guide, not as a substitute for careful thinking about whether the conduct alleged is motivated by a bad faith intent to profit. *See Lucas Nursery and Landscaping, Inc. v. Grosse*, 359 F.3d 806, 811 (6th Cir. 2004). In the instant case, the Court does not find it necessary to march through the factors seriatim. The role of this Court is not simply to add factors and place them in categories, but to discern what motivates the alleged conduct. *Id.*

In this case, allowing this claim to go forward would stretch the ACPA beyond the letter of the law and contradict Congress's purpose in enacting the statute. There is no allegation here that Plaintiffs intended to extract payments from Defendant or defraud consumers. There is no allegation that Plaintiffs intended to divert Defendants' customers to Plaintiffs' website and confuse them into purchasing Plaintiffs' products. Further Defendant fails to allege any facts suggesting why Plaintiffs would even want to try to associate themselves with Defendant. Plaintiff sells high-end clothing targeting a specific niche of consumers, whereas Defendant sells university apparel and merchandise. Lastly and perhaps most importantly, the paradigmatic harm that the ACPA was enacted to eradicate – the practice of cybersquatters registering several hundred domain names in an effort to sell them to the legitimate owners of the mark – is also not alleged to be present here.

Defendant cites *Hamptons Locations, Inc. v. Rubens*, 2005 WL 2436209, at *10 (E.D.N.Y.) for the proposition that a claim of bad faith is plausible if facts are pled which indicate defendant knew of plaintiff before registration. The *Hamptons* court, however, specifically noted that "prior knowledge of Plaintiffs' mark does not, standing alone, constitute bad faith." *Id.*; *see also, Lang v. Retirement Living Publ'g Co.*, 949 F.2d 576, 583-84 (2d Cir. 1991) (prior knowledge does not necessarily give rise to an inference of bad faith and may be consistent with good faith).

Defendant also cites a case from the Fourth Circuit, namely, *Virtual Works, Inc. v. Volkswagen of America, Inc.,* 238 F.3d 264, 270 (4th Cir. 2001). (Doc. # 38 at 10, 12.) In *Virtual Works*, the defendant used the domain name www.vw.net for its business, but it had never been referred to or done business under the name VW. *Id.* at 269. Further, the defendant in that case openly admitted its hope of profiting from consumer confusion between its domain name www.vw.net and plaintiff's VW mark, *id.* at 270, and threatened to sell the domain name to the highest bidder unless plaintiff made an offer within 24 hours. *Id.* at 267, 269-70. In the instant case, by contrast, Plaintiffs use the mark "NAU" for their clothing business, and there is no allegation that they attempted to sell the domain name.

For the foregoing reasons, this Court finds that Defendant has not pled facts sufficient to support a claim of cybersquatting.

## IV.  CONCLUSION

Accordingly, the Court ORDERS that Defendant's Motion for Judgment on the Pleadings as to Count 4 of Dlorah, Inc.'s Counterclaims (Doc. # 32) is GRANTED and Count 4 of the counterclaims is hereby dismissed.

DATED:  February   03  , 2010

BY THE COURT:

_____
CHRISTINE M. ARGUELLO
United States District Judge